Good afternoon, ladies and gentlemen. This is the time for argument in the re-hearing on bank of Hulteen v. AT&T Corporation. We understand all counsel are present and ready to appear, and that some time has been exceeded to amicus for the police. So we will proceed to hear the appeal, and counsel for the appellant may proceed. Thank you, Your Honor. May it please the Court, Joe Guerra for AT&T Corp. With the Court's permission, I would like to reserve five minutes of my time. You may, but you have to keep track of your own time. That's the whole thing. Your Honor, we submit that this Court should overrule Pallas v. Pacific Bell because it was incorrect at the time it was decided and has been further undermined by subsequent authority. First and foremost, Pallas is in an irreconcilable conflict with the Supreme Court's decision in United Airlines v. Evans. In Evans, the Supreme Court held that even though a seniority system is present effect to a past act of discrimination, if that act of discrimination is no longer actionable, the employer can rely on it as a valid action and, and this is the most critical part, does not engage in a new act of discrimination in violation of Title VII by failing to restore service credit or seniority lost as a result of that no longer actionable conduct. Pallas' holding is exactly the opposite. Pallas holds that even though 18, excuse me, the Pacific Bell's denial of service credit in 1972 had never been actionable, Pacific Bell engaged But in Evans, there was a termination. The person was not there. And she was asking, essentially asking that that circumstance be ignored, the fact that she was actually terminated and that history be reconstructed backwards. I mean, here what we have is a current determination with regard to benefits. And the question is, what's going to happen to a certain leave that was occurred that occurred many years before? But it isn't a question of undoing a termination. It had actually occurred. Gershengorn That's a factually accurate, Your Honor. But I don't think it's a legally meaningful distinction in this case. Because what Evans said is the prior discriminatory action, which in that case was a termination and in this case is alleged to have been, well, I'm not even sure it's been alleged to have been unlawful at the time, but for purposes of argument, it was a denial of service credit. In both cases, the actionable conduct allegedly is the post-enactment refusal to restore seniority or service credit that flowed from that earlier decision. And Evans holds squarely that the employer is allowed to treat that prior action as valid, is entitled to rely on it once it's no longer actionable, and does not commit a new violation of Title VII by refusing to restore the service credit lost as a result of that conduct. In Pallas, this Court said, even though the action was never actionable, the continued reliance after the PDA took effect on the denial of service credit and the failure to restore service credit is a new violation of Title VII. Those holdings, we submit, are irreconcilable tension. What act is it that occurred that's being redone? I mean, you mean there's a notation, there's an accounting notation, that's what we're talking about? We're talking about a service credit calculation, Your Honor. That's not what we were talking about in Evans. We were not talking about a calculation. We were talking about something that happened. The person was terminated. Here you're talking about a calculation that was put in an entry book for certain purposes, and now it's being used for other purposes, currently for a current decision about a current benefit. But, Your Honor, the same is true in the same realities are at play in both cases. There was allegedly a lawful act in Evans, and it led to a loss of seniority. And after the employee was rehired, after Ms. Evans was rehired, she said, I'm entitled to have my seniority back, and your refusal to give it to me is a current violation of Title VII. Same here, same in Pallas. Ms. Pallas was denied full service credit for her 1972 pregnancy leave. And in the lawsuit, the allegation was, it's the current refusal to restore the seniority I lost as a result of that pre-act conduct, which is the current violation. So it's the same in both instances where the seniority system is giving present effect to a completed transaction that the allegation is the refusal to ameliorate the consequences of that now-completed action is a violation of Title VII. Evans says it is not, and Pallas said that it is. Scalia. Are you arguing that Pallas should be overruled by this Court sitting in Bank, which is a slightly different theory than what the three-judge panel applied? We are, Your Honor. Are you abandoning the theory under which the three-judge panel found for you? Well, no. I think, as I mentioned at the outset, subsequent developments also undermine Pallas's rationale. And I plan to address those. But I don't think the issue any longer is whether or not the panel, one panel could decline on Pallas. Why isn't that the issue? Because that panel decision has been stripped of its precedential value. And so it's no longer – it no longer has any governing effect. And the question right now is, summary judgment has been entered against AT&T. Should that summary judgment be affirmed or reversed? And in order to decide that question, we think the Court should and must decide whether Pallas is good law. What is the effect of Lanscraft overruled Pallas? Excuse me? What if Lanscraft overruled Pallas? Didn't you make that argument below? I did, Your Honor. And our – well, not that it directly – but that it significantly undermined its logic. And we still make that argument. And the reason that's true is because it's clear that as Pallas construed the Pregnancy Discrimination Act, it gave that statute retroactive effect. What is the effect – I'm over here. I know. It's really hard. I can hear it echoing all around the courtroom. What is the effect of the Supreme Court's analysis in Fernandez-Vargas, which is a recent exposition on retroactivity and on Lanscraft? How does that play into your analysis? Your Honor, it doesn't change the result, in our opinion, because in that case, what the Court said was that the alien who had entered illegally and whose presence was a continuing violation under the law was claiming that the loss of the right to a certain removal procedure constituted a retroactive application. The Court said that's effectively arguing that you have a vested right to continue to violate the law indefinitely. That would be like the employer in Baysmore saying, because I've always paid black workers less than white workers for the same work, I have a vested right to continue in that conduct. So – but our case, we submit, is governed not by Baysmore, but by Evans, where we're talking about a situation where we have a completely completed transaction. An AT&T and Pacific Bell in the Pallas case begin to fund pension liabilities based on the service credit that it awarded. And it has significant and totally legitimate reliance interests in that circumstance because, particularly after ERISA, there are – there are significant funding obligations that flow from the service credit company. After – after Pallas, it still had? Excuse me? After Pallas, it still had reliance interest? I can't be right. Well, AT&T wasn't bound by Pallas, Your Honor. It wasn't party to Pallas. And, of course, it's – it operates in all of the circuits of the United States. And so can't – it's – its conduct can't be controlled by any – the first circuit that issues a ruling. But if you're trying to predict what the likely outcome is and the likely pension is for someone in the Ninth Circuit, you can't be arguing that we are – we don't have to look at the Ninth Circuit law. You can't be saying that. Well, Your Honor, what I am saying is that Pallas is different from – I'm sorry. I don't know the pronunciation of the recent Supreme Court case. Fernandez-Vargas, I think. Thank you. I'm probably wrong, too. What I'm saying is that Pallas is wrong because it's different. And it gave retroactive effect where retroactive effect wasn't found in Fernandez-Vargas because the reliance interest at stake in those two circumstances are vastly different. I accept that. But the argument that – the question that was underlying Judge Berzon's question, as least as I understand it, is, but given that Pallas is on the books and given that the relevant events took place in the Ninth Circuit, to the degree that there's any reliance, you've got to look at – you've got to look at Pallas. Now, you can argue that it's wrong, and maybe someday it gets overruled, but so long as Pallas is on the books, there it is. Yes, Your Honor. But what I'm trying to say is that the Pallas itself was wrong because it ignored the reliance interest at stake at the time that it issued its ruling, and that's why Fernandez-Vargas is a different – an entirely different circumstance. But what you're saying is that you didn't have to follow Pallas while Pallas was, in fact, on the books and good law in the Ninth Circuit, and that just isn't the case. Your Honor, I am saying that AT&T was not bound by – and was entitled to advocate, as we are here right now today, arguing that Pallas should be overruled. Right, but if it wasn't overruled, if it remained good law, what – here, hello? Hello. Something out of this box. I'm relying on the line of sight. My question is, you are – AT&T is operating here in the California West Coast area, okay, and the Ninth Circuit law governs, okay. So if – you suggested, adverted, there are funding issues. Now, what were the funding issues that AT&T was going through? Was it reserving against potential benefits on pension? Yes, it has to fund all of its pension liabilities. Your accountants would have allowed you not to reserve for potential payouts on pension benefits in light of Pallas, that they would have said, oh, no, you could have looked to – for California reserves, you could have looked for – or reserving against liabilities in the Ninth Circuit, that you could have looked outside the Ninth Circuit? Your Honor, I'm not suggesting that. What I'm trying to suggest is – So what's the reliance? The reliance interests were prior to Pallas. Pallas came along in the 90s. AT&T and Pacific Bell were funding pension obligations based on credit service decisions made in the 60s and 70s. And so that's why it's the case that the Pallas decision gave retroactive effect to the pregnancy discrimination, because it upset settled expectations. But what were the settled expectations? You were going to be able – you weren't paying out pension benefits until some time in the future. But we were funding them under requirements of ERISA that were based on the funding requirements. You would adjust the reserve. Your Honor, as of the time of Pallas, the expectations were undone. I'm saying that Pallas is wrong. I'm trying to look at – I'm looking at footnote 5 in the reply brief, and as I AT&T was not required to comply with Pallas. And basically you thought that at some point you could come in and perhaps overrule Pallas in an embankment or otherwise. Well, if I read this correctly, even if our court were to determine that Pallas is valid and has a continuing obligation, would AT&T then argue that it doesn't need to comply except with respect to the small number of plaintiffs in this case, because it's a national corporation and operates nationally, as you indicated in your footnote? Your Honor, I think we would then be bound with respect to all employees in the Ninth Circuit. And that would raise significant problems, because that may actually mean that we are bound by the – throughout the nation, because I don't think we could differentiate between employees outside the Ninth Circuit, which would mean we would have to go and seek cert at the Supreme Court. Kagan. It's particular wording of the Pregnancy Discrimination Act of any relevance here. It seems to me that the Pregnancy Discrimination Act has unusual and special wording, where it says, because of or on the basis of pregnancy, childbirth or related medical conditions, and women affected by pregnancy, childbirth or related medical conditions shall be treated the same for all employment-related purposes, et cetera. Now, isn't that literally implicated here? I mean, you have somebody who was pregnant in the past, and because she was pregnant in the past, i.e., affected by pregnancy, you're treating her differently than other people who, in the past, were not affected by pregnancy. Why isn't this just literally applicable? Your Honor, because under Evans, the rules of the Pregnancy Discrimination Act case, which is why I'm bringing it up. I understand that, Your Honor. But – but Evans still dictates the governing rule that once the service calculations were made and they were not challenged, they are the equivalent of lawful decisions. Well, that's the statute says otherwise, and that's why I'm trying to read you the statute. The statute has to – the language that you're relying on has to mean that the – that Congress meant to overturn and give retroactive effect to the statute. Every circumstance to address that question – No, it's just – excuse me. It isn't – the pregnancy was in the past, but the behavior was in the present. I mean, unless you're saying that past pregnancies don't count under the statute, that it's okay to discriminate against somebody because they had a child in 1975, so in 1980 I can fire them, that can't be right. No, Your Honor. But what we're saying is that the – the consequence – the adverse action vis-a-vis pregnancy was taken before the Pregnancy Discrimination Act was enacted. And because it was not challenged within the limitations period, the disservice denials were lawful under Evans. As a consequence, the only way that continued reliance on a service credit calculation – we're not talking about some facial discrimination against pregnancy in the post-enactment world, but a service credit calculation – the only way that reliance can now be unlawful, as Pallas said, is if the Pregnancy Discrimination Act changed retroactively the legality of that decision, imposed new obligations with respect to that decision, and it created – all of which were completed actions. And if I – if I may, Your Honor, one point about the – the NCS system that I think may be lost in the – in the briefing here. There is no aspect of the NCS system that draws any distinction on the basis of pregnancy or sex or gender. The NCS system simply looks at whether – what a date is and calculates – ascribes various benefits as a result. When the service credit calculations were made here, the NCS system looked to see whether the leaves were paid or – paid disability or personal leaves. If they were personal leaves, then they were treated as entitled to service credit only for the first 30 days and not thereafter. So the – it's the leave policy that governed whether or not pregnant women got service credit for their leaves prior to 1979. The NCS system did not dictate that then. It does not dictate that now. All it does is give effect to the service credit calculations that were made before this Act took place. Under Evans, the continued reliance and a refusal to restore service credit is not a new action. But wait a minute. In Evans, there was something to challenge in the past, i.e., the termination. Okay. Here, there was a calculation on a piece of paper. Until it affected the person, what was she supposed to challenge? Your Honor, first of all, it was more than a number on a piece of paper. It was – it was attributed to the – it was distributed to the employees at all time. It affected their vacation rights. It affected job preferences. It affected their – But they're not challenging it in that – in that respect. They're only challenging how it's affecting their pension. Did they – did they even know it was going to affect their pension? It's hard to see how they couldn't, Your Honor, since NCS dictates term of employment which drives pension rights. But the fact is, it was actionable. And indeed, lawsuits were brought challenging AT&T's pregnancy leave policies. That's different. That's challenging the leave policy. But you're now claiming they should have challenged the calculation. No, Your Honor. I'm saying that because the leave policies were not challenged, and because there were service credit calculations dictated by those policies, those service credit calculations are now the equivalent of lawful decisions. And the only way liability can be imposed on the basis of post-enactment reliance and a post-enactment refusal to restore the service credit is if the Pregnancy Discrimination Act is given retroactive effect, because Evan says that the refusal to restore service credit that results from a now lawful or no longer is not a current violation of Title VII. So the only way that there can be a violation here is if PDA had retroactively altered the legality of those decisions and retroactively imposed new burdens and duties on AT&T with respect to that. You keep talking about reliance with respect to putting a setting aside money, funding, and so on. What precisely do we have in the record that tells us how much money AT&T either did or did not set aside based upon what you claim to be the reliance? I don't believe there's any evidence about the amount of funding, Your Honor. You've got to make it up? No, Your Honor. I mean, the entity assume that they've done that? Your Honor, they were obligated to under WISA to fund pension liabilities. But there's nothing in the record that tells us that they did or how much they did? No, I don't believe there is, Your Honor. Okay. One other question, and this was asked earlier, but assuming that Palace, for the moment, that Palace was good law when decided or that we institutionally are not in a position to challenge that or to discuss we would prefer not to, what has happened since? In other words, do you still have are you still arguing, as you were before, that the validity of Lanscraft? And could you address that argument? Yes, I could, Your Honor. First of all, I think I've touched on some of these things already in that because the Palace construed the PDA to impose new obligations with respect to completed transactions, it imposed a duty to restore service credit lost as a result of pre-PDA leave policies when, prior to the enactment of the PDA, there was no such duty, both under Gilbert but also under Evans, because at the time, once the allies agreed, so let's assume you're right about that and we were wrong. Now what? Well, that's sufficient. No, no, but now what in terms of what has happened since that should make us change our mind? I understand we're unbanked and we could change our mind, but suppose that our position is we're only going to change our mind if something's happened since. Okay. But what I'm suggesting, Your Honor, is the very fact that there is a new obligation to restore service credit is – demonstrates under Lanscraft that the PDA was given retroactivity. But did Lanscraft change anything in that regard with regard to retroactivity? With regard to the definition of what is retroactivity? Your Honor, there's – this not – this Court has, in panel decisions, deemed Lanscraft a sea change in the law, a significant change in the law. As to that issue, I mean, Fernando Vargas, for example, cited some way old cases and said that Lanscraft simply carried them forward. Your Honor, in Lanscraft itself, the Court – Scalia would beg to differ with you. Yes. With me, Your Honor. That Lanscraft was a sea change in the law, if you read – Your Honor, if you look at his decision in the Kaiser Aluminum, he points out that there is a – there is a irreconcilable tension between two lines of retroactivity analysis in the Supreme Court, and Lanscraft is what resolves that tension. But also, beyond Lanscraft, you have the Spink decisions. This Court held in Spink that if a statute is interpreted to require an employer to include pre-enactment service years in a post-enactment benefit decision, which is exactly what the allegation is here, that statute applies retroactively. And that – that's exactly what the plaintiffs are seeking. That's exactly what Pallis required. And that logic is plainly correct. Now, in the Supreme Court, the plaintiffs say, well, Pallis was – excuse me, Spink was overruled on a different ground in the Supreme Court. The Supreme Court had to have endorsed that logic because Mr. Spink argued to the Supreme Court not only that the statute at issue there, the 1986 OBRA, was intended to have retroactive effect, but even if it wasn't, what he was seeking wasn't retroactive relief. And the Supreme Court said, no, the statute does apply only prospectively, and for plan years prior to its effective date, there can be no liability imposed for failure to put in pre-enactment service. Therefore, I never addressed your retroactivity question because I just read the statute as resolving the problem, whatever it meant. Two problems with that theory, Your Honor. First, that wouldn't have resolved his claims in the court because he argued that even if it wasn't retroactive in its scope, he wasn't seeking retroactive relief. And when this case came back to this Court on remand, this Court understood Spink to have disposed of that claim. And they said the only issues left now are the equitable estoppel issue and the breach of fiduciary duty claim. So – and the logic of Spink, we submit, is unassailable because if you don't have to include service years before the effective date of an act, and then a new statute comes along and says, when making post-enactment benefit calculations, you now must include years of service for which you previously had no legal obligations to make pension benefits based on, then you have given the statute a retroactive effect. Sotomayor. Let me make sure I understand. So if an employer in 1965 or 64, when the civil rights acts were fought, had a practice of permitting pensions only to white people who had worked 20 years and not to black people, then the person who – the black person who retires in 1967, having worked 20 years, is not entitled to a pension. Is that right? I think that is right, Your Honor. And – and I think one point I'd like to make, I realize that's a grotesque result that – and our modern sensibilities rebel, but I think Congress – the solution is Congress can express its desire for retroactive relief when it chooses to. Do you – do you have any case that says that? It says what? Has that ever been litigated? Do you have any authority? For what purpose? It says that that's – that that would be a retroactive application. Your Honor, in fact, Baysmore demonstrates this. In Baysmore, the employee – the employer continued to pay black workers less for post-enactment work, for the same work that it paid to white employees. And it said, we don't have to change this because it's the way we've always done it. And the Supreme Court said, no. After Congress changed the law, it outlawed that very disparate salary structure, and you can't continue to pay people less in a – in a salary basis. But the Court went out of its way to say, but you do not have a right to recover for pre-enactment, pre-effective date salary disparities under Title VII. The Court noted that there might be such a right under – under the 14th Amendment. It didn't address that question. But those were for wages paid prior to 19. Those were for wages. Service – I just want to emphasize, service – service credit is a form of compensation. And what Pallis required is that you go back and true up not salaries, but service credit calculations. Nobody is requesting that they be paid for the leave that occurred before the effective date of the statute, even though they might have been paid if they'd been disabled. Nobody's suggesting that. They are suggesting, Your Honor, that they are entitled to the – the compensation of service credit for those leaves. And that is a form of compensation. They're entitled to be treated now the same as people – because of the pregnancy, for the period they were disabled, the same as people who were disabled at the basis of a current decision. But, Your Honor, they are not similarly situated to those people because at the time that they're – that they lost the service credit during their pregnancy leaves, they were not entitled to them. And at a bare minimum, the fact that they never challenged it means that those decisions are legal. So today, they are not similarly situated to colleagues who started on the same day and took paid disability leaves of similar duration. They have lawfully calculated lesser seniority. Because they were discriminated against on the basis of pregnancy. At a time when it wasn't illegal and now at a time when it's no longer subject to challenge. Is your theory that what should have happened in 1979 is that they should have bought a declaratory relief action about pension benefits, even though pension benefits were not due to be payable until a certain point in the future and might be speculative? Your Honor, actually, they – they had the right to bring claims based on the loss of And that was the basis of the lawsuit that was in Southwestern Belle, the Eighth Circuit. That was the basis of the lawsuit that this Court heard in the Harris case, where employees said we were not given accrued seniority on our – during our leaves. And that's unlawful. And who said those claims were unright? And those cases were not tied into any actual impact at the time, either – either relative seniority, jobs, promotions, or anything that was actually operative at the time? I don't believe there were claims that I have lost this job or I was denied. It was the same types of claims that we have here, which is these rights will affect me, and this is a burden to me. And so there was – and these employees could have made precisely those same claims. Counsel, do you agree or disagree with the proposition that what we're looking for here is congressional intent, that Congress had the right to decide on either outcome, and it's just a matter of trying to understand what they did? Yes, Your Honor. And every court that's addressed the question has said that they did not intend the statute to apply retroactively. And, in fact, they gave an adjustment. The statute? You mean the Pregnancy Discrimination Act? Correct, Your Honor. And that – and in fact, the legislative history shows that they – they postponed the effective date in order to give employers a chance to change their policies, which is exactly what AT&T did. But that's a shorthand answer. I mean, the question is what do they intend as to this particular circumstance. And as I indicated by reading the statute before, it seems to me at this particular circumstance, you can characterize it as retroactive or as not retroactive as we can see. So perhaps the best way to answer the question is to look at the statute and not characterize it as anything. If we look at the statute, it seems to me that it answers the question in a different way than it would answer the question, for example, do I have the right now to get paid for the leave that I took in 1978? That's a different question. Well, Your Honor, I submit it's the same question because the compensation took two forms, salary and service credit, and they were denied both at the time. Okay. You have about three minutes left. Thank you, Your Honor. I'd like to reserve the balance of my time. Good afternoon, Your Honors. My name is Henry Hewitt, and I am representing the plaintiffs in this case. And I would like to begin by finding what we are saying is the unfair labor practice that is at issue in this case, namely that AT&T's post-PDA practice of using a formula for calculating an employee's NCS date, which incorporates as a criterion that women will not be given credit for temporary disability due to pregnancy in excess of 30 days if that pregnancy-related leave occurred before the effective date of the PDA in 1979, while giving full credit for other forms of pre-PDA temporary disability in calculating everyone else's NCS date. So you're so because this is where we spend a lot of time discussing retroactivity of the statute. I take your position to be we don't even have to look at retroactivity because what you have is one ongoing system with continuing disparities in the treatment of pregnant women versus people who have had pregnancy leave as opposed to personal leave. To an extent, I agree with you, Your Honor. We certainly think that there is a post-PDA transaction, which is at issue here in this case, and which is the unlawful employment practice. And what is that exactly? Right. In concrete terms, in the action that they're taking. Right. That is when an employee, a woman who took leave prior to the PDA, retires or anybody retires and is going to get benefits. At that point, a calculation is made of benefits, and that calculation incorporates the pre-PDA standard which disfavored women who took pregnancy leave. And it is that act that is the unfair labor practice. Now, Counsel, the Seventh Circuit had essentially this issue in the Emeritec case. How can you distinguish what was going on there? I think the facts were the same, Your Honor. I think that in Emeritec, they made the mistake of relying on Evans, which we do not think is the applicable line of cases to rely upon, but rather that the Basemore case is. And in particular, in Evans, the termination due to marriage was a discreet act that the plaintiff applied for a job, got the job, and at that point, they refused to give her credit. But the refusal to give her credit in that instance was a practice that applied to everybody. Aren't we really talking about the current effect of a past discrimination which happened to be legal at the time as opposed to some sort of continuing discrimination? No, Your Honor. I think that it is accurate to say that there's an effect, but I don't think that that ends the analysis. That's because we still have a transaction that is occurring post-PDA. Well, why doesn't it end the analysis? Because this statute is the PDA, which was not involved in Evans, and which has particular language and uses the word women affected by pregnancy, and doesn't talk about whether the pregnancy was a pregnancy in the past or a pregnancy in the present. So if they're presently affected by a past pregnancy and the policy relating to it, why isn't the statute answer the question? Well, I think that the statute, to that extent, does answer the question, if I'm understanding you correctly, Your Honor, that the statute does answer the question. Correct. But I think that Evans also, as Justice Brennan pointed out in his footnote in Basemore, said that the only practice that was considered to be an unlawful employment practice in Evans was the termination due to marriage, and the time had run to file a claim on that. The system by which she was denied service credit was applied to everybody, regardless of the reason they were terminated and rehired. And consequently, that was not deemed to be treatment that was different for one group than another. There was not a dissimilar treatment of similarly situated persons. And so Evans is a different case. We are the --. Do you think that -- excuse me, Your Honor. I'm sorry. Is it the EOC's position, but I don't know whether it's your position, that this was, in fact, legal at the time, i.e., had a SOTI cut in this case? This is cases somewhere between Gilbert and SOTI, and I don't know whether you have a position on whether it was actually illegal even at the time. I don't know if that makes any difference, either, but -- I'm not sure that it makes any difference either, Your Honor. I think our position is that SOTI, because it was a denial of a benefit to pregnant women that was deemed to be a violation of Title VII, is analogous to our case, unlike Gilbert, where it was that they would not give an additional benefit. So we think that SOTI really is much more analogous to our case than Gilbert. However, our analysis in this case does not depend on a finding that the P -- that was illegal before the PDA. I'd like to explore with you the issue of how this does or doesn't differ from a situation of a vacation accrual or calculation. Counsel for ATT said this doesn't really apply only to a retirement or pension situation, but also to vacation. And as I understand your point, of course, your clients are only retiring after the act was passed. But presumably, they took advantage of various vacation accrual before the act was passed. Do you think if it were vacation being analyzed, that the result would be the same, assuming that the same accrual rules affected them because of the type of pregnancy leave they took? If I'm understanding your question correctly, yes, Your Honor. In other words, we are saying that if there is a post-PDA transaction which incorporates the pre-PDA rule about pregnancy leave and only giving 30 days and otherwise calling it a personal leave, if that is part of what AT&T is using in its calculation of a vacation benefit or a retirement benefit, I think our position would be consistent would say that each was an unlawful employment practice post-PDA and not unlawful employment. But would you need to challenge that from the point of the PDA enactment plus the statute limitations if it were a vacation situation? Or would you somehow get around Morgan and say each time you needed to take your vacation, there is a new violation? Yeah. We say that it is each time a new violation. We are not – this is, first of all, to answer what I – the Morgan part of this. We are not using a continuing violation theory at all in this case trying to take what is allegedly an unlawful employment practice and somehow pulling with it something that's outside the statute of limitations theory. That is not at play here. I don't know if that is responsive to your question or not. Yes. But we're not – Oh, I understand you're not trying to take a continuing violation. But I am asking, then, with respect to vacation, your view is every time somebody takes a vacation post-PDA who is affected by this calculation, that that's a new violation of the PDA, is that correct? That would be correct. And the pension violation is a singular violation that occurs when? The pension violation occurs when the calculation and assignment of a benefit is made. We are not here saying that each retirement check is a new violation, as in Baysmore. We are saying that there is a transaction, namely, the calculation of benefits, that occurs after the PDA. You couldn't have known what it was going to be back when you were first pregnant or anything else. At that point, there is a discrete act, and as a discrete act, it may be challenged as long as you file your charges within the 100 days of the statement. If I understand your argument there, the calculation is made, but the calculation is made on the basis of a foundation of service credits, which were determined long before the PDA, correct? They were determined long before the PDA, but in that regard, I don't think there's any difference from Baysmore. Baysmore, the salary structure before Title VII was perfectly legal. It was its use afterwards that became illegal. We are making an analogous argument here, that the use after the PDA of what may arguably have been legal before becomes illegal when you start to use it now. Does the record show the damp? There's no catch-up of the damp of the lost salary in Baysmore. What's the difference? The lost salary, we are not claiming here that the plaintiffs are entitled to anything that they lost before the PDA. It's economically exactly the same. Isn't it? You just got through saying Baysmore is substantially the same. No, Justice, in Baysmore — No, that — I don't believe so, Your Honor. Just as, for example, in our case, if a woman had lost a promotion pre-PDA because of the way her NCS date was calculated, assuming that the — that was the case, that was the case, that was the case, that was legal conduct, she would not have a claim, just as — But more simply, isn't it true that you're not claiming for it to be paid for the disability leave pre-PDA? Exactly. And that's the analogy, it seems to me. I would agree. And I think that it's analogous to not getting paid — the people in Baysmore not getting paid for whatever they lost pre-Title VII. Having been accrued or not, right? Excuse me. I'm sorry, Your Honor. It was accrued, right? It was accrued before the passage of Title VII. And you want that re-accrued, recalculated. No. We're not asking that that be recalculated. In Baysmore, what we're saying is that when you have as part of your salary structure, after Title VII becomes effective, something that continues that disparate treatment, then you are engaging in illegal discrimination. That's the problem I have with your argument, though, counsel. In Baysmore, the conduct which violated — in other words, in Baysmore, the discrimination was a continuing discrimination because you were playing — paying blacks less than whites for the same work. Here, the company changed its policy, no longer calculates the disability the way it used to, and there is — there is no current discrimination. That's — that's how it looks to me. What's wrong with that? What I believe is wrong with that, Your Honor, is, again, that we are talking about the transaction at the point where retirement benefits are calculated. Which is what, 1979? No. 1990, 1994, whenever the person happens to retire. At that point, AT&T undertakes a calculation. It is an act, and it is that act which incorporates the prior standard for calculating the NCS date. Does this record show, as to the particular plaintiffs or any of the class members, whether the particular pension benefits that are being calculated now were under plans that existed at the time? Did the plans exist at the time, i.e., the time being pre-PDA? Were they different plans? Were they different — or were they different rules under the same plans? Was this predictable, uniformly, or sometimes yes, sometimes no? I would say sometimes yes, sometimes no is as much as the record tells us. Also, presumably not predictable in 1979 was who was going to be there long enough to retire. Right. Or what the nature of a retirement program was. Well, that's what I'm saying. Was the nature of the retirement program changed, or some of them were changed? They weren't set. In other words, whether they were changed or not, AT&T had the ability to change it, and as a consequence, their failure to do that, again, in incorporating the pre-PDA standard. But the failure to do that can only be as a result of the PDA in 1979. So aren't you giving retroactive effect to the PDA? In other words, it's the PDA that is still driving a change in pre-PDA law. You've got — you have benefits that were — that were calculated pre-1979, retirement benefits. The only thing that will — that will require — not benefits, but excuse me, credits, service credits. The only thing that would require today AT&T to redo that is the PDA, right? No, they could do it for any variety of reasons, including a conclusion that it's going to be illegal for them today to be incorporating that prior standard. But why would it be illegal today? Because today you cannot discriminate on the basis of pregnancy, and that is what they are doing. But they're not discriminating on the basis of pregnancy. At this point, they haven't done that since 1979. But with respect to the women who took leave prior, I mean, prior to the PDA and didn't get full credit, they are discriminating against them. Well, they did at a time when it was not prohibited. Right. And when they do it now, when they still continue to do it now, because it's undisputed that those women are plaintiffs, are going to receive less benefits than someone who had a temporary disability for reasons other than pregnancy. So the fact that they were pregnant pre-79 means that they are now — they are now women who are affected by that pregnancy in a way different than the people — than the people who were pre-79 for purposes of a current benefit. Correct. Let's suppose that the plan — back here. Thank you. Go ahead. I'm sitting low in the chair here. Let's suppose that the — purely hypothetical, that before 1979, the policy was that anybody who stayed 25 years with the company would get a Cadillac or, you know, a really terrific car upon retirement, and that the discrimination was a racial discrimination that occurred, and then Title VII comes in and says you can't discriminate. So a long time — and as a result of that discrimination, African Americans didn't get, at the end of their retirement date, they were short by two years that had been cut off because they were being discriminated against. Is what you're saying that it would be putting into the current timeframe the award of the car, clearly a benefit that they were promised if they quit in their 25 years, that they would not be getting a car because of racial discrimination? If I followed your hypothetical, I think the answer is yes, that if they were not given certain credits towards the car before Title VII, and that standard continues to be used after Title VII comes into effect, that is conduct which violates Title VII, just as in Basemore. Is it possible, theoretically, or the way this plan works, that you could draw a line in 1979 and give some kind of — Thank you. Yeah. — pro-rata credit going forward? In other words, what you've said is they're not getting anything they wouldn't be entitled to under the PDA. And I hear that in the abstract. But I'm wondering if, in effect, you are suggesting that they get credit beginning at the time they took their leave going forward until their retirement. Or is there an alternative sort of, if you will, a compromise situation where you could give some kind of a pro-rata credit going forward after 1979, even though you wouldn't be giving them full credit for what they might have accrued pre-1979? I don't know of anything that would make it a legal obligation for that to occur. I think that probably AT&T would have had the discretion to have done that, just as they had the discretion to completely give full credit to women who took pre-PDA — Mr. Eards, I guess — let me stop the — you haven't really answered the question, because — I'm sorry. AT&T had the discretion to pay these people full up, but they didn't. Right. So they didn't exercise that discretion, which would have landed them somewhere other than in this courtroom. But my question is whether, as a legal matter, if you're saying that they really are only getting benefits that they're entitled to as you interpret the statute going forward, is there a mechanical calculation that can be made that would draw a line in the sand that would, in effect, give them stepped-up benefits going forward in pro-rata to their leave — in other words, not giving them the same detriment — and, in effect, saying, but I'm not really paying them for what occurred pre-1979? That, I don't believe so. Okay. Counsel — Answer yes, because you don't think you're paying them for what's pre-1979. No one's being asked to pay them for pre-1979. Maybe I misunderstood the question. We are not claiming that they are being paid for pre-1979. All we are saying is now they're entitled to not be discriminated against based upon. Right. I understand that. But what you are saying is that the leave that they took pre-1979 should be treated the same as the leave everybody took pre-1979, unrelated to whether it was pregnancy or some other reason. Correct? Correct. Counsel, if — over here — if the statute governing pregnancy is ambiguous as to whether it is or is not intended to govern this situation, what — to what extent should we defer to the EEOC's interpretation in the Compliance Manual or in its brief to this Court under Chevron, Mead, et cetera, et cetera? Right. Well, we, of course, would say a deference should be given. We also, of course, say that the law without regard to those guidelines dictates a result in our favor. But I see no reason that those guidelines should not be given the kind of treatment that Chevron and so on say regulation should be afforded. But one problem I have, however, is this. I gather that part of the money you're claiming is for some period of time that pre-PDA the — there were mandatory leaves that wouldn't be valid afterwards. In other words, mandatory — are you also claiming that those times periods should be calculated — should be counted even though the people were not, in fact, disabled during that time period? Are you talking about the forced leave situation? Yes. Right. Yes. We would say the same thing. Doesn't that seem much more like Evans? I mean, aren't you at that point saying that even though these people were not, in fact, unable to work during that period and were not really comparable to the disabled people, so you're not writing that problem, it's not a current different treatment of pregnancy. Rather, you're trying to write the fact that they were forced to take time off that they weren't otherwise had to take off. So that seems to me to be in a different category from your main category. I would still say, though, that not being given credit for the forced leave affects the amount of benefits they get. It affects — But they're not literally at that point covered by the current Pregnancy Discrimination Act, except retroactively. See, that's where I see the difference between Evans and this case. Then you are trying to switch something that happened in the past, i.e., you're trying to say they shouldn't have been forced off. You're not simply saying I'm going to currently take this pregnancy leave period that they were disabled and treat them the same as other people who are disabled. You're saying we're going to reconstruct the past in some way. It seems to me quite hard to distinguish from Evans. That subcategory of the case. I take your point. I still maintain the position I stated, but at this point — Counsel, before you leave that point, why shouldn't we focus on the determination that is made by the company on a continuing basis? For example, once the act passed, from then on, obviously, the company was required to comply but had made a determination that there was no further obligation retroactively. Why shouldn't that be the triggering date for the statute of limitations analysis? Because that is not the transaction. That is an issue with retirement. Well, sure it is. On a continuing basis, you're accruing credits. And then on the very last day of your work, whatever you have stored up, you get paid. Right. But you do not know, and AT&T does not know, until they actually do a trans — do a calculation and you actually have terminated your employment or retired. That is the point at which the unlawful employment practice, in our view — I hear your argument. Thank you. Your Honor, it's Paul Ramshaw for the EEOC as amicus. The cases, Laurance, Evans, the cases where it — 70 — that in effect gave — that gave effect to 703H and said you can rely on a seniority system. Those cases were cases where the seniority system itself was facially neutral. The Court stressed that again and again in Teamsters and in Evans. In Evans, they said you're not — men are not being treated differently with respect — or women are not being treated differently from men in respect to breaks in service. In Teamsters, they said blacks are not being treated differently. This is — it's just a matter of there was bargaining in seniority or position seniority in Laurance. Here, you've got a seniority system where you're — where in counting how long someone's been with a company, you're discriminating against women affected by pregnancy. It — if I can — let me try to make an analogy to — we know from Laurance, footnote 5 in Laurance, we know one example of a facially discriminatory system, and that is one where men are getting — are earning seniority at twice the rate that women are, okay? So let's say that we had a company like that, that before 1965 was giving men seniority on a one-for-one basis, and women got seniority only on a one-for-two basis or 50 percent basis. They had to work two years to get one year of seniority. Then in 1965, to comply with the Title VII, the company changes its plan so in the future, we're going to count every — everyone gets one-for-one seniority. Now, can they continue — can they rely on those seniority dates based on the facially discriminatory system that even though it was lawful? No, I don't think they can. Let me — But what does 703H mean? 703H says it's — it's lawful for you to — to treat men differently from women if it's based on a bona fide seniority system, okay? It's a defense in Title VII to a discriminatory treatment on the basis of — Is it the — is it the commission's position, then, that this is not a bona fide seniority system? That's correct, because it's facially discriminatory. Well, is it a seniority system at all is one of my questions. You sort of assume it is, but I'd always thought a seniority system was basically as  competitively, so to speak, and that a — a service credit system at this point, at least in ordinary parlance, I wouldn't call a seniority system. I don't know whether there's — the case law calls it a seniority system. 703H talks about seniority systems, merit systems, different kinds of systems. Some of them, obviously, it says it applies to compensation, but a seniority system as such doesn't seem to me to be a compensation issue. It's a competitive system, ordinarily. It means how are people relative to each other rather than how — where are you absolutely? I — if it's — I think — I think a lot of the — a lot of cases do say seniority can be used both for competitive purposes and for benefits purposes. But if it's not a seniority system, then it's even more clearly the case that once the law is passed, you have to treat — you know, use the Newport News formula when a woman retires, you have to treat her the same as you would treat her as if she were a man in terms of counting how long she's been with a company and, therefore, how many — what she gets in terms of benefits. It — that is, it's not — it's not a retroactive application of the Act to say that once the law — once the law has changed, you now have to count how long they've been with a company in compliance with the new law. AT&T argues strenuously this is not facially discriminatory because it wasn't unlawful before 1979. First of all, I have a — we have a problem with that. We think that — we think that Satie probably governs here more than Gilbert because Gilbert was how much do you get paid while you're gone? Satie was what kind of seniority do you have when you come back from your — from your leave? And that's this case. This case is — they are — they are worse off in their seniority than people who — people who took other kinds of disability leaves. Does this — does this mean, then, that on day one after the Act was passed, that AT&T or any other employer had to recalculate service credit for purposes of vacation or anything else they used it for short of retirement, which hadn't yet occurred? Yes. Okay. Yeah. And the — and certainly after — after Palace, they had to do that. I mean, when you talk about, you know, reasonable expectations in terms of complying with the law. But yes, I — when the law is passed and you're — and you're making a decision about a benefit or a competitive job opportunity based on how long someone's been with the company, you have to treat men and women equally. Right. Your time has expired. Yes. Thank you. Thank you, Your Honor. There's one fundamental point I would like to leave you with, and that is this notion that the NCS today reincorporates criteria based on pregnancy and reapplies a discriminatory policy vis-a-vis women who took pregnancy. That is simply not the way the NCS system works. The NCS system today looks at an NCS date and calculates pension benefits accordingly. There's nothing on the date that says whether — But then we come back to the hypotheticals you were given. Suppose that pre-1964, you were accrediting women with half as much seniority as men, and you then turned around today and said, well, that's fine. We're just going to look at the NCS date. You have to — to make an assist, you have to say that's fine. I am — I am saying that's fine. I'm saying that — that the service credit is a form of compensation, and it was — So — so even though today women are going to get benefits, fewer benefits, as compared to people who actually worked exactly the same amount of time they did. You would say that the fiction that was created earlier is — is blocked in stone, and the fact that you're today making a decision and could just as easily just do it differently doesn't matter. Your Honor, I'm saying that if there's no legal obligation to do it differently unless the PDA applies retroactively. But what you're saying, then, is the Carr hypothetical, where you don't get the bonus, even though two employees, white, black, been there the same time, but the black employee was shortchanged by two years pre-Title VII. You're saying too bad. They both leave on the same day. One gets to the car, one doesn't. Yes, Your Honor. I mean, these are obviously unpalatable results. But the answer is Congress can outlaw that effect by making a statute retroactive. But given — It's an effect that you're making into an act, a piece of paper that writes something down that you can rewrite after the act. Your Honor, the act of calculating seniority credit is not a — a ministerial non-event. It is a genuinely important event that does affect all of these — you mentioned whether it's a real seniority system.  You said, and I think it would be a matter for common agreement among the people in this room today, that the consequences that are spelled out in the hypotheticals are unpalatable, and if Congress wanted to deal with it, it could. Well, I come back to Judge Berzon's reading of the statute. It seems to me one way to read the statute, maybe even the compelled way to read the statute, they talk about effective pregnancy. It may be right there in the statute. Your Honor, I think this — well, this Court would then be creating a split with every other circuit, and it would have to overrule its own decision in the Wampine case, although I admit that wasn't a very thought-through analysis. But this Court there also said that the statute only applies prospectively. But the NCSOTC — But that's, again, playing with the word retroactive and prospective. Now, I realize your time is running, but retroactive, it's a tricky word, even though we know what we mean. For example, let's have a situation which, before Title VII, there's only a men's washroom because only men are employed. After Title VII, women are employed now in equal numbers, and all of a sudden, we've got to redo the building. Well, that's a retroactive effect. They built it one way, and now they've got to build it another way. No one in the world would call that retroactive application. Well, Your Honor, I'm not sure what the — what the retroactive — you're not being asked to go back and — since there were no women in the workforce beforehand, there's no claim for going back and paying them anything different. That's what we've got here. You've got people saying, I were — we were denied service credit, which is a form of compensation for — for leaves we took before there was any obligation on AT&T's part to award full service credit. And now they're saying you must go back and restore that service credit to me. That, I submit, is creating a new obligation where none existed before the statute was passed. Your time has expired. Thank you, Your Honor. Thank you. Case disargued is submitted for decision. I complete the Court's calendar for this afternoon. The Court stands adjourned. All rise.
judges: Schroeder, Reinhardt, O'scannlain, Rymer, Hawkins, Graber, McKeown, Wardlaw, W.fletcher, Fisher, Gould, Paez, Berzon, Bybee, Callahan